Thank you, Your Honors. Good morning, Your Honors. Katherine Young from the Federal Public Defender's Office for Appellant Colin Nathanson. Mr. Nathanson pled guilty to mail fraud pursuant to a plea agreement in the factual basis of which he admitted that he was responsible for the operation and management of NIT and that investment interests involving NIT and other entities were sold to the public by telemarketing entities that Nathanson and his longtime friend, business associate, and 50-50 business partner operated. He was sentenced to 324 months based upon numerous enhancements which he challenges on appeal, some of which he challenges on appeal. The first enhancement that I want to turn to is the one that was the largest disputed enhancement, the enhancement for leadership role under Section 3B1.1. That was a four-level enhancement. Mr. Nathanson showed that he was merely a figurehead of these companies, that he, in fact, had a passion for golf and was involved in the golf aspect and developing golf clubs and the golf business, whereas his business partner, Mr. Risch, was involved in the telemarketing aspect of the operations. But Mr. Risch put the operations in Mr. Nathanson's name because Mr. Risch had tax problems, could not own a company, could not have a bank account, could not hold a formal position. So was it your position that Risch was the leader or the organizer? Well, they were 50-50 partners. I think Mr. Nathanson in his declaration proved that Mr. Risch had more of a hand in the operational aspects and Mr. Risch profited equally, if not more, than Mr. Nathanson. But we had two leaders. The two leaders there could be. I mean, I think that would still not qualify for the enhancement because one of them has to lead the other under the terms of the guideline. But can't they lead other people, though? They have to lead criminally responsible participants. And there were only two criminally responsible participants, Mr. Nathanson and Mr. Risch. The telemarketers were not criminally responsible participants. And the terms of the guideline, Section 3B1.1, states that if the defendant was an organizer or leader of a criminal activity that involved five or more participants, then you apply the guideline. A participant in the application notes is defined as someone who is criminally responsible. The guideline says a person who is not criminally responsible is not a participant. An application note 2 tells us with respect to 3B1.1, the entire guideline, to qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. And we hark back to the definition of participant as being someone who is criminally responsible. Isn't there alternative language or an otherwise extensive? That's exactly what the district court relied on and erroneously contended under this Court's precedent. Because the application, the fact that 3B1.1 does contain language, the otherwise extensive language, that's what the district court relied on, erroneously as we contend under LUCA. But if you go to the application notes, which are authoritative and which must be followed, it says that to qualify for an adjustment under this section, under 3B1.1, the defendant must have been the organizer, leader, manager, or supervisor of one or more other criminally responsible participants. So the otherwise extensive does not apply unless you have, unless you have a defendant who is an organizer or leader, et cetera, of a criminally responsible participant. So that would have to be Risch. That would have to be Risch. In this case. It would have to be Risch. It would have to show that he was the organizer, leader, manager of Risch. And we contend that under the facts that were submitted by the defense in this case, he did not organize, lead, or supervise Risch. In fact, if anything, the contrary was true. It was Mr. Risch who decided the format of the operation while Mr. Nathanson was devoted himself to the golf clubs and improving the golf clubs and selling the golf clubs, whereas it was Mr. Risch who had the securities experience and had the securities license, whereas Mr. Nathanson only had a high school education. It was Mr. Risch who was responsible for the telemarketing aspects of their operation and setting up the companies. Your education doesn't necessarily dictate who's the leader. In this case, didn't Nathanson direct the telemarketers? And he had his hands all over this. Well, I think the evidence shows, and it was the defense argument, that it was, in fact, Mr. Risch was the one who was directing the telemarketing aspect, whereas Mr. Nathanson was focusing on the golf aspects and developing the golf clubs. But I do want to point out, too, that in this Court's prior precedent LUCA, the courts in LUCA, the courts said it did not need to identify any criminal responsible participants because it was otherwise extensive, just as the district court did in this  And this Court reversed in LUCA, saying 3B1.1 cannot apply unless the district court identifies a participant over whom the defendant exercised managerial or organizational control. And the defense did object below to the fact that Mr. Nathanson was not an organizer or leader of Mr. Risch and that, therefore, that guideline, that enhancement could not apply. So unless there are no more questions on that particular enhancement. Yes, Your Honor. Why were the filings in this case under seal? I think that some of the filings were under seal because Mr. Nathanson cooperated. And usually cooperation is filed under seal because that's something that you don't want released to the public, especially in the prison context. Are you going to address abuse of trust next? Yes. I was going to go to – exactly, Your Honor. Abuse of trust was going to be my next point. He was also given a two-level enhancement under abuse of trust, Section 3B1.3, which states that if the defendant abused a position of public or private trust in a manner that significantly facilitated commission or concealment of offense increase. The application notes of that section say that position of public or private trust refers to a position of public or private trust characterized by professional or managerial discretion. And it goes on to state that the adjustment applies in the case of embezzlement of a client's fund by an attorney serving as a guardian, a bank executive's of a patient by a physician. All of those in the nature of fiduciary relationships. Application note 3 goes on to explain further that this is intended to be in the context of a fiduciary relationship because it tells us – It doesn't have to be, though, right? Cases say it doesn't have to be a fiduciary relationship. It doesn't have to be, but the case – there are a lot of cases saying it's in the nature of a fiduciary relationship, maybe not necessarily a fiduciary relationship, but it has something of those criteria and characteristics. Didn't we have some of that here? I don't think so at all, Your Honor. These were telemarketers making cold calls to strangers. At the request of Rich and or Nathanson. Yes. And they were given information from Nathanson in particular about what to say. These telemarketer callers didn't make this stuff up. Nathanson made them up. Yes, but the question is whether those telemarketers had a fiduciary relationship vis-à-vis the stranger that they were calling up. A fiduciary relationship is like a doctor-patient relationship or in the case of a fiduciary has a duty to put the – now I've got the principal and agent mixed up. But the principal – the agent has to put the principal's interests above the agent's interests. And that's what an investment broker does. He is putting his client's investment interests above his own interests. He's in the nature of fiduciary. That's why the application of the Section 3B1.1 tells us that it applies to that circumstance. And we've cited a number of cases from all over the country with respect to this where you've got telemarketers making cold calls to strangers. It's an arm's-length commercial transaction. You don't create a fiduciary relationship just by telling someone, trust me, because that's inherent in the nature of fraud. So, therefore, if you apply the abuse of trust relationship or the abuse of trust enhancement to a common – an arm's-length fraud transaction, as was done in this case, you basically are double-counting because you're not adding anything by the abuse of trust enhancement. As some of the cases say, in every case of fraud the defendant will have gained the confidence and trust of the victim. But fraud alone does not justify the enhancement. A sentencing court must distinguish between arm's-length commercial relationships and those where a fiduciary or trust relationship exists. Only the latter circumstance justify the enhancement. The courts also say that at the bottom, the application notes term position of public or private trust is a term of art. In this case, the defendant has gained the confidence and trust of the defendant by appropriating some of the aspects of the legal concept of a trustee or fiduciary. There has to be something more than showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required. And we contend that in this case, you simply don't have a fiduciary function when you've got telemarketers making cold calls to strangers. And I see that I have a minute and a half left, but I'd like to reserve for rebuttal . Your Honor, good morning. Rob Keenan for the government. I'd like to focus initially on the reasonableness, substantive reasonableness of the sentence. I'd like to not let you start there if you don't mind. Very well. I'd like you to address those two enhancements because, frankly, those are the two enhancements that bother me. And if you could address the arguments, I would appreciate it. Certainly. Let's talk about abuse of trust first. There are two basic grounds for why the relationship between the defendant in this case and the victim investors was a private trust relationship. First, the defendant had a relationship where he held himself out, even though he wasn't a licensed advisor. He held himself out as an investment advisor for the victim investors. To whom did he hold himself out? To the victims directly. Telemarketers? To the victims directly. Did he ever talk to any of the victims? He wrote letters to them. And, yes, he did speak to investors as well. Well, isn't it just like somebody that goes on a used car lot and listens to the pitch from the salesman and then sues him for abuse of fiduciary duty? Under the guidelines, when a person holds himself out as an investment advisor, whether he's licensed or not, that is a private trust relationship. That's what the application notes say. In addition, on an alternative ground, just the mere agreement of the defendant to hold the investor funds for the Nathanson Investment Trust, to hold those in trust for the victims who placed their funds with him, also creates a trust relationship. There's a Tenth Circuit case. It's probably our best case on that point. Kohn, I believe, K-O-E-H-N, as well as, I think, another case we cite. So it's those two grounds. The agreement to hold funds for the investors with a promise that they're going to be invested in a certain way and that they'll be returned if the promised IPO, the fraudulent IPO, didn't go forward, that the funds would entirely be returned. You're saying that's similar to, for example, a lawyer holding funds in escrow for a client or holding funds or a guardian holding funds and then turning around and stealing the money. Absolutely. It's the same thing. The investment advisor, I don't want to suggest that I'm just labeling an advisor relationship. We've detailed in our brief a number of letters that Defendant Nathanson, under his own signature, sent out to the entire pool of NIT investors where he provides investment advice. I think this is a worthwhile investment. I think we should, you know, hold the line and keep the investment with the IPO company, the utterly fictitious IPO company. So it wasn't just the telemarketers? It wasn't just the telemarketers. It was him himself, absolutely. And he also indirectly caused a trust relationship with the victim investors because he did identify his subordinate employees, the telemarketers, who he deemed to be investment advisors, or I'm sorry, consultants was the word. He held them out in the same vein as he did himself. I think it's really important that the Court not adopt the defense argument that the abuse of trust adjustment doesn't apply in Ponzi cases. The guidelines contain no application notes that limit application of that adjustment to Ponzi cases. It's a fact-based analysis. If you look at all of the defendant's cases, it's a fact-based inquiry. And we cite to no less than six cases involving similar facts to the case here where the courts, several, six different circuits, applied the abuse of trust adjustment in Ponzi schemes involving investment fraud. Lastly, on this abuse of trust enhancement, there's a lot of references in the opening brief of the defendant to Contreras and how it changed the law after the sentencing hearing. The important point there is Contreras changed the law only in the sense that it said to the extent some of these prior circuit cases apply it to low-level, apply this abuse of trust enhancement to low-level employees, they're wrong, and that shouldn't be done. There's no need, Contreras doesn't prompt any need for a remand in this case because we don't have a low-level employee. It doesn't change the terrain at all as to the application of that enhancement. There's no need for a remand, for reconsideration in light of Contreras. As to the leadership organizer role, let me just cut to the facts here, which I think it's, first the parties agree that Mr. Risch was a criminally culpable participant under the guideline. And there's no real argument, as I understand it, from the defense regarding the extensive nature of this fraud scheme. It went on for years, scores of employees, multiple offices, multiple different fraudulent schemes including the NIT scheme, plenty extensive. So I want to focus, and I submit that the record does show that the defendant was the leader and organizer of the entire organization. And that includes Daniel Risch, his partner. Mr. Risch referred to himself as the 50-50 partner of Mr. Nathanson. The record, in his plea agreement, in his change of plea hearing, the defendant admitted that he was, quote, responsible for the operation and management of NIT. That's the core scheme charged in the indictment. In paragraphs 11 through 20 of the pre-sentence report, and these facts are not objected to by the defendant, the record makes clear the defendant founded all of the fraudulent business entities, including the telemarketing entities that he used to orchestrate this fraud. The notion that, oh, that was Dan Risch's doing, the telemarketing part of the operation, simply isn't a fair characterization of the record. But the record makes clear that in the pre-sentence report and in the factual basis of the plea agreement that Mr. Nathanson created all of those and put himself in as the CEO and President of those companies. I'd like to get back to the trust relationship again. I realize that your time is limited. But the commentary on the guideline says that the enhancement may be applied only when the position of trust contributed in some substantial way to facilitating the crime. So what was the substantial way in which the trust relationship contributed to the facilitation of the crime? It was essential to the scheme. These victims were people who listened to a telemarketer who gave them a prepared pitch. And then they said, yes or no, send me the stuff or I'll take it or I won't or whatever. But where did the trust relationship play a substantial role? The entire promise made to the victim investors in this case is that if you give us your money, you get a chance to get in on the ground floor of an IPO. And if the IPO doesn't happen, we'll hold on to that money for you and we'll give it right back. And to supplement, to avoid questions, to blunt questions, the defendant said that he was subject to a confidentiality agreement with this utterly fictitious company and therefore couldn't answer any questions about the details about what the company was, no details because I can't answer them. So the entire nature of the relationship required the victims to trust the defendant. That's the way he structured and orchestrated this entire scheme. It's not an arm's-length transaction where you're buying a car or a borrower-lender relationship with a bank, as in the Second Circuit case they cite to U.S. v. Jolly. It's a relationship where he puts himself out as an advisor, says this is a worthwhile thing to do, trust me on this, this is a good investment. I know we're all going to score big once this IPO or merger happens. So was it your position that this special or what some cases call this intimate relationship with investors was developed by him, created by him, and he executed it through these letters that he wrote to these people? That is exactly right. And getting back just briefly to the leader, I see I'm close. Even though they never met him face-to-face? Correct. He actually did meet some of the investors face-to-face. Some of the investors, including, frankly, a federal agent who investigates fraud cases, wanted to show up and talk with him, wanted to see that there was a real building, make sure it was legitimate. So he did speak directly to some of the investors on the phone and in person, not just through the letters. And lastly, just getting quickly back to the leader-organizer role, paragraph 27 of the pre-sentence report, also this is directly out of the plea agreement as well, all of the NIT funds were misappropriated and diverted, quote, at the defendant's direction. It's language the defendant owned up to at the change of plea hearing. So he was in control of the entire operation. He also admitted in the declaration in the SEC case where he moved to quash the SEC subpoena that he opened and controlled the NIT account from where all of the investor money went. Not Mr. Rich. So for that reason, he was the leader and organizer of the entire operation, including one of the employees, Dan Rich. All right. Thank you. Thank you. Rebuttal. Thank you, Your Honors. Before returning to the abuse of trust, I just want to refer to one thing with respect to the leadership enhancement, and that is that the prosecutor alluded to the plea agreement. The plea agreement obviously does contain admissions by Mr. Nathanson as to what he did, but it also makes clear that Mr. Rich was involved in these decisions. It says Ms. Nathanson and Rich organized the sale and offering of securities. That's on page 8 of the plea agreement. And in other parts of the plea agreement, Nathanson on page 5, Nathanson together with Rich knowingly executed the scheme to obtain money. And so throughout the plea agreement, it's clear that Nathanson and Rich were 50-50 partners and that Nathanson did not lead Rich. Now, focusing on the abuse of trust enhancement, the government relies on two prongs. The first is that the money would be held in trust. He said that he would give the money back if the investment did not go forward. He didn't say that he would hold it in trust. What's the difference? Well, I think that the other point I would make is that even saying you'll hold it in trust does not necessarily create a trust relationship because it's not like an escrow company. But I think what he's saying is we're touting this investment, and that's also the difference between Well, he's saying I'm going to protect your money and I'll give it back to you if this doesn't happen. Yes, but in any fraud, I think the investor seeks the I mean, the fraudulent, the person who's committing the fraud seeks the trust and confidence of the investor. And the prosecutor referred to the fact that he held himself out as a consultant, but the cases refer to and the guideline refers to an investment broker, which is an agent. And also a broker has the discretionary involvement, which the guidelines tell us is a key characteristic of this enhancement. A broker handles the client's funds and decides how to invest them. In this case, he portrayed himself as a consultant with respect to one investment that he was touting and asked people to invest in. And I think I'm over my time, so unless there are any further questions, I'll submit. Thank you. Thank you to both counsel. The case is argued and submitted for decision by the court. We'll be in recess for 10 minutes. All right. This court is now in recess for 10 minutes. Thank you.    My days of hearing boxes are behind me. About your inquiry, if you talk about this motion in Limoney, you claim that Stoddard filed a motion in Limoney about the post-advice conduct. And the minute order that you cite doesn't support that. So I sort of scoured the record and I couldn't find the motion in Limoney. I wish you had put this message in a little earlier. Well, I'm sorry, I just hadn't realized over the weekend as I was preparing. Let me just hold on and see if I can answer that. Okay. My best guess that would be that was the pre-trial or the beginning of the proceedings, the reference to the information. But let me not speak out of school. Sure. I think in your reply brief you cite to a March 20, 2006, minute order. And that order is the court's order denying Defendant Dowie's motion regarding what he calls consciousness of innocence, which is his polygraph information. But actually the two, I think the two are intertwined in that discussion, if I remember correctly, the transcript. Maybe not so much, maybe not explicitly in the minute order, but in the transcript. Right in the transcript, I think. It's not raised at all in the transcript. Okay.  All rise. Thank you. Please be seated. The final case on calendar for argument is United States.
judges: Zouhary, Goodwin, Rawlinson